Jeffrey B. Landa (CA SBN171217 / USDC #FL00007)
1202 S. 24th Avenue
Fargo, North Dakota 58103
Direct Telephone:    612.306.8542
Direct Fax:              561.287.4472
Email:                     JBLLawyer@gmail.com

Robert A. Waller, Jr. (CA SBN169604 / USDC#CA00008)
LAW OFFICE OF ROBERT A. WALLER, JR.
P.O. Box 999
Cardiff-by-the-Sea, California 92007
Telephone:    (760) 753-3118
Facsimile:      (760) 753-3206
Email:            robert@robertwallerlaw.com

Attorneys for Plaintiff MEDIA SYNDICATION SERVICES, INC.

**UNITED STATES DISTRICT COURT**

**IN AND FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MEDIA SYNDICATION SERVICES, INC., A Maryland Corporation, | CASE NO. |
| Plaintiff, | COMPLAINT FOR DAMAGES |
| v. | 1.  BREACH OF WRITTEN CONTRACT [Count One and Count Two]; |
| NATIONAL ASSOCIATION OF REALTORS, A Not-for-Profit Corporation, DOES 1 through 25, inclusive, | 2.  TORTIOUS INTERFERENCE WITH CONTRACT |
| Defendant(s). | 3.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE |
| | **JURY TRIAL DEMANDED** |

Plaintiff MEDIA SYNDICATION SERVICES, INC. ("Plaintiff" or "MSS") brings this action for (1) breach of contract, (2) tortious interference with contract, and (3) tortious interference with prospective economic advantage against Defendant NATIONAL ASSOCIATION OF REALTORS ("Defendant" or "NAR") based on the following allegations.

/ / /

/ / /

/ / /

## JURISDICTION AND VENUE

1.     This court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 (diversity jurisdiction) because Plaintiff MSS is a Maryland corporation whose principal place of business is located at 660 Pennsylvania Avenue SE, Suite 303, Washington, DC 20003.

2.     Defendant NATIONAL ASSOCIATION OF REALTORS ("Defendant"), represents itself to be, and is thereon alleged to be, a not for profit corporation whose corporate headquarters is located at 430 North Michigan Avenue, Chicago, Illinois 60611, and which maintains an office at 500 New Jersey Avenue NW, Washington, DC 20001.

3.     The parties are therefore citizens of different states for purposes of diversity jurisdiction pursuant to 28 U.S.C. §1332.

4.     The minimum amount in controversy exceeds $75,000.00.

5.     Venue in this district is proper pursuant to 28 U.S.C. §1391(b)(1).  Alternatively, venue in this district is proper pursuant to 28 U.S.C. §1391(b)(2), because a substantial part, if not all, of the events and/or omissions which directly give rise to the claims, and the acts and/or omissions which have a close nexus to the wrongs alleged herein, all occurred and/or took place in Washington, DC, and the principal witnesses to the events, acts, and/or omissions surrounding the claims, as well as documentary and other electronically stored information (ESI) are all believed and thereon alleged to all be located in Washington, DC.

## THE PARTIES

6.     Plaintiff MSS is in the business of developing and producing radio and broadcast programs.  Beginning in or about 2008, Plaintiff MSS contracted with Defendant NAR for the development and production of a talk radio program designed to focus on the real estate marketplace and issues important to the real estate industry.

7.     Defendant NAR is a national association who's objects are, among other things, to "provide a facility for education, research and exchange of information for those engaged in the recognized branches of the real estate business, including brokerage, management, mortgage financing, appraising, counseling, land development and building, and

1   education and research in real estate, in the United States of America, its insular

2   possessions and the Commonwealth of Puerto Rico, for the purpose of raising the

3   standards of real estate practice and preserving the right of property ownership in the

4   interest of the public welfare."

5   8.      Plaintiff MSS is ignorant of the true names, capacities, and/or identities of those

6   defendants named herein as DOES 1 through 25, inclusive and therefore names these

7   defendants by such fictitious names.   Plaintiff MSS is informed, believes and thereon

8   alleges that each of the fictitiously named defendants is thereon responsible in some

9   manner for the occurrences herein alleged, and that Plaintiff MSS's harms, losses, injuries

10  and damages as alleged herein were proximately caused by such negligence, acts, errors

11  and/or omissions of the fictitiously-named defendants.   Plaintiff MSS alleges that at all

12  times mentioned herein, each of the defendants and/or DOES was the agent, employee,

13  servant, partner and/or representative of each of the remaining defendants, and in doing

14  the things hereinafter alleged, was acting within the course and scope of such agency,

15  employment, servitude, partnership and/or other relationship and with the consent of each

16  other.

17                    **FACTUAL BACKGROUND**

18  9.      This lawsuit flows from Defendant NAR's having breached the written contract

19  which is attached to this Complaint as Exhibit 1 ("the Contract") and surrounding conduct

20  by Defendant NAR in anticipation of breaching the Contract and following the breach.  The

21  nature and purpose of the Contract was for Plaintiff MSS to produce for Defendant NAR

22  a nationally syndicated weekly radio program which eventually came to be named "Real

23  Estate Today."   The principals responsible for producing and running the Real Estate

24  Today radio show were Paul Woodhull from Plaintiff MSS and Stephen Gasque, who was

25  and still is Director of Broadcasting from Defendant NAR.   Both Messrs. Woodhull and

26  Gasque work in Washington, DC, and the Real Estate Today show was produced, recorded

27  and broadcast from offices located in Washington, DC.

28

10.     Prior to and during the time the Contract was in effect, and prior to it being breached by Defendant NAR as herein alleged, Plaintiff MSS employed the professional services and skills of Walter Powers to arrange guests to appear on Real Estate Today and to write and review scripts for the program.  Because of the nature of the radio production business both Mr. Woodhull and Mr. Gasque worked closely together on production of the show including approving the guests who would appear on the show as coordinated by Mr. Powers, and the approval of scripts that had been written and/or reviewed by Mr. Powers.

11.     After execution of the Contract the parties each performed as required under the contract until on or about October 13, 2015, when Defendant NAR notified Plaintiff MSS that their services would no longer be needed in producing the Real Estate Today program thereby terminating Plaintiff MSS from performing any further services under the Contract and breaching the Contract.

12.     Immediately prior to notifying Plaintiff MSS that its services would no longer be needed in production of the Real Estate Today program for the final year (2016), Mr. Gasque contacted Mr. Powers and solicited his (Powers') professional services to arrange guests and write scripts for a "demo" radio program.  Plaintiff alleges that in reality, and in fact, the "demo" radio program was a continuation of the Real Estate Today program which was the subject of the Contract.  As such, Plaintiff MSS alleges that Defendant NAR did not cancel or terminate the Real Estate Today program or its distribution.

13.     After Defendant NAR terminated Plaintiff MSS's services under the Contract, Stephen Gasque continued to produce and air the Real Estate Today program and Mr. Gasque became the host of the program.  Plaintiff MSS alleges Defendant NAR has continued to produce and air Real Estate Today through March 5 and 6, 2016, and as recently as May 11, 2016.

14.     Defendant NAR has continued to produce and air Real Estate Today after terminating Plaintiff MSS's services in breach of the Contract.  Attached to this Complaint as Exhibit 2 are screenshots taken from Defendant NAR's website www.realtor.org

evidencing that Defendant NAR still produces, promotes and advertises the Real Estate Today radio program.

## FIRST CAUSE OF ACTION

### [BREACH OF CONTRACT - COUNT ONE]

15.     Plaintiff MSS incorporates each preceding paragraph and all allegations as though set forth herein.

16.     On or about February 14, 2014, the Plaintiff MSS and Defendant NAR entered into a written contract (hereinafter "the Contract") which is attached hereto as Exhibit 1, the terms and conditions of which are incorporated in their entirety herein by this reference.

17.     At no time between February 14, 2014, and December 31, 2014, which is defined in the Contract as the "Initial Term," did Defendant NAR notify, inform or otherwise advise Plaintiff MSS that it (Defendant NAR) desired to terminate, cancel, modify, novate or otherwise change any of the material terms and/or conditions of the Contract. Nor during the Initial Term did Defendant NAR notify, inform, or otherwise advise Plaintiff MSS that it (Defendant NAR) had any intentions other than to perform all the terms, conditions, and covenants of the Contract for the entire duration of the Contract which ran from on or about February 14, 2014, through December 31, 2016.

18.     On or about October 13, 2015, Defendant NAR notified Plaintiff MSS that Defendant NAR would not honor the final year of the Contract. In so doing, Defendant NAR breached the Contract.

19.     At all times Plaintiff MSS performed all terms and conditions required of it by the Contract.

20.     As a direct and proximate result of Defendant NAR's breach of the Contract, Plaintiff MSS has suffered damages, harms and losses in an amount according to proof at trial.

/ / /

/ / /

/ / /

**SECOND CAUSE OF ACTION**

**[BREACH OF CONTRACT - COUNT TWO]**

21.     Plaintiff MSS incorporates each preceding paragraph and all allegations as though set forth herein.

22.     Pursuant to the terms of the Contract, Defendant NAR "shall not (i) employ or offer to employ any of the current employees and/or engage or offer to engage any of the current vendors of MSS during the Term of this Agreement and for a period of one (1) year after the termination of this Agreement, or (ii) offer employment to any former MSS employee(s) and/or offer engagement to any of the current vendors of MSS period (sic) for a period of one (1) year after termination of their employment and/or engagement with MSS, whether voluntary or involuntary, without the prior written approval of MSS. This provision shall not apply to the Program host." See, Exhibit 1 (the Contract) at page 4, "Employees and Vendors."

23.     For many years prior to and during the effective term of the Contract (2/14/16 - 12/31/16), Plaintiff MSS utilized the professional services and employed a non-party to this action, Walter Powers ("Mr. Powers"). At all times herein there existed a contractual employment and/or vendor relationship between Plaintiff MSS and Mr. Powers.

24.     In or around early October 2015, Stephen Gasque, Director of Broadcasting for Defendant NAR, contacted Mr. Powers and solicited Mr. Powers' professional services to assist Defendant NAR in production of a "demo" radio program. In reality and, in fact, the "demo" radio program was nothing more than a continuation of Real Estate Today, the same radio program which Plaintiff MSS had been producing prior to Defendant NAR breaching the Contract and which is the subject of the Contract at issue in this action.

25.     When Mr. Gasque contacted Mr. Powers and solicited his professional services, Mr. Gasque knew or in the exercise of reasonable care given his position as Director of Broadcasting as well as the frequent contact Mr. Gasque had with Plaintiff MSS personnel, including Mr. Powers, should have known the terms of the Contract prohibited him and/or any other person at Defendant NAR from utilizing or attempting to solicit or

1  otherwise employ Mr. Powers' professional services.  Mr. Gasque knew or in the exercise

2  of reasonable care should have known that given Mr. Powers' longstanding professional

3  and employment relationship with Plaintiff MSS that to solicit, contact, or attempt to

4  employ Mr. Powers for the benefit of Defendant NAR was a violation and breach of the

5  terms of the Contract.

6  26.     At all times Plaintiff MSS performed all terms and conditions required of it by the

7  Contract.

8  27.     As a direct and proximate result of Defendant NAR's breach of the Contract as

9  herein alleged Plaintiff MSS has suffered damages, harms and losses in an amount

10  according to proof at trial.

11  <center>**THIRD CAUSE OF ACTION**</center>

12  <center>**[TORTIOUS INTERFERENCE WITH CONTRACT]**</center>

13  28.     Plaintiff MSS incorporates each preceding paragraph and all allegations as though

14  set forth herein.

15  29.     At all times herein mentioned there existed a valid and enforceable contract for

16  employment between Plaintiff MSS and Walter Powers whereby Plaintiff MSS would

17  employ Mr. Powers to arrange guests for appearance on the radio program and to write

18  and review scripts for radio programs produced by Plaintiff MSS.

19  30.     At all times herein mentioned Defendant NAR, and Stephen Gasque as Director of

20  Broadcasting for Defendant NAR, was aware of the employment and/or vendor

21  relationship which existed between Plaintiff MSS and Mr. Powers.  Because Ms. Gasque

22  was Director of Broadcasting he was therefore an agent and acting on behalf of and for the

23  benefit of Defendant NAR in doing the things alleged herein.

24  31.     Plaintiff MSS alleges in or about early October 2015, Stephen Gasque approached

25  Mr. Powers and solicited his professional services in the production of the Real Estate

26  Today radio program including soliciting Mr. Powers to provide Defendant NAR the same

27  types of professional services which Mr. Powers had been providing Plaintiff MSS in the

28  production of the Real Estate Today program, to wit: arranging for guests to appear on the

program and/or writing and reviewing scripts. Plaintiff MSS alleges Mr. Gasque solicited Mr. Powers services after making the decision, but prior to notifying Plaintiff MSS, that Defendant NAR would be terminating (and thus breaching as herein alleged) the Contract for production of the radio program.

32.     Plaintiff alleges Mr. Gasque's conduct in soliciting and attempting to employ or hire Mr. Powers away from, and to effectively compete with Plaintiff MSS, was an intentional and unjustifiable inducement for Mr. Powers to breach the then-existing employment and/or vendor agreement between Plaintiff MSS and Mr. Powers.

33.     Plaintiff MSS alleges Mr. Gasque, in his role as Director of Broadcasting for Defendant NAR, acted at the direction of and/or for the benefit of Defendant NAR in doing the things herein alleged. Plaintiff MSS alleges Mr. Gasque's actions and conduct as herein alleged were ratified and/or condoned and/or approved of by the officers, directors and/or principals of Defendant NAR and/or were done with the actual and/or constructive knowledge of Defendant NAR.

34.     As a direct and proximate result of Defendant NAR's breach of the Contract, Plaintiff MSS has suffered damages, harms and losses in an amount according to proof at trial.

35.     Stephen Gasgue's conduct in his position as Director of Broadcasting for Defendant NAR was intentional, oppressive and/or malicious in that it was done with a conscious and knowing disregard for the specific term of the Contract set forth in Exhibit 1 at page 4 ("Employees and Vendors"), and was done with a knowing and conscious disregard for the rights of Plaintiff MSS. Plaintiff MSS is therefore entitled to an award of punitive or exemplary damages against Defendant NAR in an amount according to proof at trial but in an amount sufficient to set and make an example of Defendant NAR for those in the same industry.

/ / /

/ / /

/ / /

## FOURTH CAUSE OF ACTION

## [INTENTIONAL INTERFERENCE WITH

## PROSPECTIVE ECONOMIC ADVANTAGE]

36.     Plaintiff MSS incorporates each preceding paragraph and all allegations as though set forth herein.

37.     At all times herein mentioned there existed a long-standing business relationship between Plaintiff MSS and Walter Powers whereby Plaintiff MSS would employ Mr. Powers to arrange guests for appearance on radio programs and to write and review scripts for radio programs produced by Plaintiff MSS.

38.     At all times herein mentioned Defendant NAR, and Stephen Gasque as Director of Broadcasting for Defendant NAR, was aware of the business relationship between Plaintiff MSS and Mr. Powers.  Because Ms. Gasque was Director of Broadcasting he was the agent and acting on behalf of and for the benefit of Defendant NAR.

39.     Plaintiff MSS alleges that in or about early October 2015, Stephen Gasque approached Mr. Powers and solicited his professional services for production of radio programing, including but not necessarily limited to the Real Estate Today program.  Mr. Gasque solicited Mr. Powers to provide the same professional services as he (Mr. Powers) had been providing to Plaintiff MSS, to wit: arranging for guests to appear on the program and/or writing and reviewing scripts.  Plaintiff MSS alleges Mr. Gasque solicited Mr. Powers services after making the decision, but prior to notifying Plaintiff MSS, that Defendant NAR would be terminating (and thus breaching) the Contract for production of the Real Estate Today radio program.

40.     Plaintiff MSS alleges Mr. Gasque, and thus Defendant NAR, interfered intentionally and tortiously with the business relationship between Plaintiff MSS and Mr. Powers in an effort and with the intent to interfere with Plaintiff MSS's prospective economic advantage and ability to produce radio programs.

41.     Plaintiff MSS further alleges that in or about 2014, Plaintiff MSS, with the assistance of Mr. Powers engaged on an ongoing basis the Mortgage Bankers Association about

producing a podcast production.   Following Defendant NAR's and Mr. Gasque's solicitation of Mr. Powers the business relationship between Plaintiff MSS and the Mortgage Bankers Association terminated and Plaintiff MSS suffered the loss of that prospective economic advantage.

42.     Plaintiff MSS alleges Mr. Gasque acted at the direction of and/or for the benefit of Defendant NAR in doing the things herein alleged.  Plaintiff MSS alleges Mr. Gasque's actions and conduct as herein alleged were ratified and/or condoned by Defendant NAR and/or were done with the actual and/or constructive knowledge of Defendant NAR.

43.     As a direct and proximate result of Defendant NAR's actions as herein alleged Plaintiff MSS has suffered damages, harms and losses in an amount according to proof at trial.

44.     Stephen Gasgue's conduct in his position as Director of Broadcasting for Defendant NAR as herein alleged was intentional, oppressive and/or malicious in that it was done with a conscious and knowing disregard for the specific term of the Contract set forth in Exhibit 1 at page 4 ("Employees and Vendors"), and was done with a knowing violation of the rights of Plaintiff MSS.  Plaintiff MSS is therefore entitled to an award of punitive or exemplary damages against Defendant NAR in an amount according to proof at trial but in an amount sufficient to set and make an example of Defendant NAR.

## **PRAYER FOR RELIEF**

1.     For economic damages, plus interest, according to proof at trial.

2.     For punitive or exemplary damages according to proof at trial for the Third and Fourth Causes of Action.

3.     For costs of suit and such other fees and/or costs as may be awarded according to proof at trial.

4.     For such other relief and may be fair, just and equitable

By,

Dated: June 21, 2016

/s/ Robert A. Waller, Jr.
ROBERT A. WALLER, JR.
Attorneys for Plaintiff
MEDIA SYNDICATION SERVICES, INC.



EXHIBIT 1

## PRODUCTION AGREEMENT BETWEEN
## NATIONAL ASSOCIATION OF REALTORS· AND
## MEDIA SYNDICATION SERVICES, INC.

THIS AGREEMENT, dated this __th day of February, 2014 by and between Media Syndication Services, Inc., with offices at 660 Pennsylvania Avenue, SE, Suite 303, Washington, DC 20003 (hereinafter "MSS"), and the NATIONAL ASSOCIATION OF REALTORS®, an Illinois not-for-profit corporation with offices at 430 North Michigan Avenue, Chicago, Illinois 60611 (hereinafter "NAR").

Whereas, NAR distributes a nationally syndicated weekly radio program on topics related to homes and home ownership (hereinafter the "Program");

Whereas, MSS has the skills and access to the facilities necessary for the production of radio programs; and

Whereas, NAR desires to have MSS produce NAR's radio program and MSS desires to provide those services.

Now, Therefore, in consideration of the mutual promises and covenants set forth hereinafter the parties agree as follows:

**Scope of Services.** MSS agrees to provide on a weekly basis all services necessary to produce the Program and to deliver the Program for distribution. These services will include:

- MSS will be responsible for securing on-air talent and staff to research and write the Program, including securing and scheduling guests participating in the Program. This will include maintaining continuity among the on-air talent for the Program, however if any change to the on-air talent becomes necessary, NAR shall have the right to approve the change.
- Identifying a source for local field reporters who will be able to record and transmit to MSS regional or local content for use in connection with the Program.
- Developing in conjunction with NAR a script (outline) for each weekly radio program and obtain NAR's approval of that script. As a part of script development, NAR may require the use of content identified by NAR. Any third party content to be used in the production of the Program, including its cost, shall be subject to NAR's prior approval.
- Providing all research and writing for the Program.
- Producing the Program based upon the approved script
    - securing all necessary facilities and resources required to record to the Program
    - completing all post-production work (e.g., audio mixing) required to make the Program ready for broadcast, including securing any licenses required from third parties for use of Program content.
    - obtaining NAR's approval of all content proposed for use in each iteration of the Programs. MSS will develop a mutually agreed upon schedule to be used for obtaining NAR approvals in a timely manner for production of the Program. Content not approved by NAR will not be included in any Program.
- MSS will use the existing standard template for production of the Program of approximately fifty four (54) minutes for each hour. The template will include slots for advertising totaling sixteen minutes per hour. The template will also include four or five content slots totaling thirty-eight minutes of content per hour the production of which will be the responsibility of MSS. Each

1

content slot shall have a theme which will be regularly followed in the production of the Program to provide the Program with a standardized look and feel.
- Distribution of the Program to NAR's radio station affiliates, including meeting required deadlines for submission of the Program for satellite and FTP feeds, subject to NAR having provided MSS with timely approvals for the Program.

All production services must be consistent with the highest standards within the industry, including compliance with laws or regulations affecting the delivery of these services, to insure the ability of NAR to deliver a first-class radio program to NAR's media outlets.

**Fees.** In full consideration of the services of MSS hereunder, including all talent, management fees, creative team costs, studio costs, distribution and related miscellaneous costs NAR agrees to pay and MSS agrees to accept an annual fee of 458,051.00 for 2014, which will be prorated from February 14, 2014 until the end of the year for a total fee of $401,579.00. The fee to paid to MSS by NAR in equal monthly installments. For 2014, the payments will be made in 10 ten equal installments. If the Agreement renews for additional terms as described below, the fee will increase by 2% or $467,212 for 2015, and then increase by 2% more in 2016 or $476,557.

NAR will also reimburse to MSS the cost of any outside pieces used in Program content slots. MSS shall provide NAR with copies of the invoices for such outside pieces on a monthly basis and NAR will reimburse MSS within thirty (30) days.

Upon 30 days notice to MSS, NAR can cancel the distribution services provided by MSS described above. If NAR terminates these services, MSS's annual fee will be reduced by $30,000. This amount will be prorated over the remainder of the period that NAR has remaining and is not using the MSS's distribution services.

**NAR responsibilities.** NAR agrees to establish a liaison to serve as MSS' primary contact for issues related to the Program. The liaison shall be responsible for receiving and reviewing all issues related to the content to be included in the Program in accordance with the schedule agreed upon by NAR and MSS.

NAR shall make available content created by NAR as well as the results from its research reports and surveys for use as a part of the Program.

NAR shall cooperate with MSS in identifying and providing experts and spokesperson from NAR's staff to address real estate issues.

**Ownership and Original Work.** MSS agrees to and hereby does assign in perpetuity all right, title and interest, including copyrights, in the Program, any and all materials prepared in connection with the Program, the collateral materials, research results and any other copyrightable works produced under the terms of this Agreement. MSS agrees to cooperate with and execute any documents NAR reasonably deems necessary to accomplish this assignment.

MSS warrants that all of the materials MSS provides for the Program shall be original work product, work for which MSS has secured the perpetual and irrevocable right to use in the manner specified in this Agreement, or work which is in the public domain, and which does not violate any copyright, patent or other intellectual property right, including trade secrets.

2

**Term.** This Agreement shall be effective on February 14, 2014 and shall continue in effect from that date through December 31, 2014(the "Initial Term"). After the Initial Term the Agreement will renew for up to two additionals term of one year each unless either party provides notice to the other (as provided for hereinafter) at least sixty days prior to the end of the Initial Term of the party's intent not to renew the Agreement.

**Termination.**
If NAR, in its sole discretion, decides to cancel the Program and its distribution, NAR shall give MSS sixty (60) days notice of the Program cancellation, and upon completion of that sixty (60) day period, this Agreement shall terminate and neither party shall have any further obligation to other including production of the Program or payment of fees. In entering into agreements in connection with the production of the Program, MSS shall include similar rights of termination in the event of Program termination.

Either party may terminate this Agreement at any time upon notice to the other party in accordance with the provisions set forth below if the other party breaches any material term hereof and fails to cure such breach within thirty (30) days after receiving notice of such breach from the non-breaching party. In the event of any termination, the parties will cooperate with each other and take all reasonably requested steps to assist the other in preparing final accountings, obtaining or reviewing records necessary to make final payments, and to otherwise conclude the parties' relationship under this Agreement

The rights and obligations set forth in the Sections of this Agreement on "Limitations of Liability" "Representations, Warranties and Indemnification" and "Employees and Vendors" shall remain in effect after termination or expiration hereof.

**Limitation of Liability.**  Neither party to this Agreement shall be liable for punitive, consequential, indirect or other special damages under any provision of this Agreement or for any act or failure to act even if advised of the possibility of such damages. Any controversy, dispute or claim of whatever nature arising out of this Agreement the parties shall first seek to resolve by prompt, informal good faith negotiations between the parties before any action is commenced to enforce the terms of this Agreement.

**Representations, Warranties and Indemnification.**  Each party hereby represents and warrants to the other that it has the full power and authority to enter into this Agreement and to perform its obligations hereunder. NAR will obtain all releases, authorizations, consents and waivers necessary for authorization to broadcast the material provided by NAR to be included in the Program (except the Advertisements and/or Sponsorships) and shall provide copies of same to MSS upon request. MSS will obtain all releases, authorizations, consents and waivers necessary for authorization to broadcast all other material to be included in the Program (except the Advertisements and/or Sponsorships) and shall provide copies of same to NAR upon request. NAR and MSS shall mutually indemnify and hold each other, their affiliates, all advertisers and their respective advertising agencies, harmless from and against any claims made for unauthorized use by any persons, their heirs, assigns and the estates of any such persons, whose names, voices or material are included in the Program, and from and against any other losses

3

resulting from a breach by either party of their respective representations and warranties made in this paragraph.

Each party hereby agrees to indemnify and hold harmless the other party from and against any and all claims finally adjudicated, arbitrated or settled with the consent of both parties (which consent may not be unreasonably withheld), and any and all expenses (including reasonable attorneys' fees, witness fees and investigation and court costs), damages, causes of actions and losses, arising out of a breach of any agreements, warranties or representations made by the indemnifying party.

**Assignment.** Neither party shall assign any rights, duties or obligations hereunder without the prior written consent of the other party; provided, however, such consent will not be required if NAR wishes the right to assign this agreement to any wholly-owned subsidiary corporation of NAR. This provision shall not limit MSS' ability to contract with third parties to perform portions of MSS' responsibilities under this Agreement, but such contracts shall not relieve MSS of any of its rights, duties or obligations under this Agreement. NAR shall have the right to review all such agreements to assure that they otherwise protect and preserve NAR's rights as established under this Agreement.

In the case of a business reorganization, merger or acquisition of a party or, in instances where a party itself or its parent or any of its affiliates acquire or are acquired, that party shall provide to the other party written notice of the business reorganization, merger or acquisition and the other party shall have the right to terminate this Agreement by providing written notice within thirty (30) days thereof. In the event the Agreement is not terminated, the terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the party, and no permitted assignment will relieve any party hereto of its obligations and duties hereunder that have accrued prior to the assignment.

**Employees and Vendors.** NAR and its affiliates shall not (i) employ or offer to employ any of the current employees and/or engage or offer to engage any of the current vendors of MSS during the Term of this Agreement and for a period of one (1) year after the termination of this Agreement, or (ii) offer employment to any former MSS employee(s) and/or offer engagement to any of the current vendors of MSS period for a period of one (1) year after termination of their employment and/or engagement with MSS, whether voluntary or involuntary, without the prior written approval of MSS. This provision shall not apply to the Program host.

**Compliance with Law.** NAR and MSS, and any on-air employees or contractors of either, in all capacities hereunder, will comply with all requirements of law, including the Communications Act of 1934, as amended, and all applicable rules and regulations of the Federal Communications Commission and any other governmental authority, and all laws, rules and regulations concerning the broadcasting or distributing of obscene, defamatory, indecent or other prohibited matter, and those laws, rules, and regulations protecting the property or privacy rights of third parties. Without limiting the generality or breadth of the foregoing, Client, MSS, and any on-air employees or contractors or either will not accept or agree to accept nor pay or agree to pay any money, service or other valuable consideration for the inclusion of any matter as part of the Program. The term "service or other valuable consideration" as used in this Agreement

4

will not include any service or property furnished without charge or at a nominal charge for use on, or in connection with, a broadcast of the Program unless it is so furnished in consideration for an identification in such broadcast of any person, corporation, entity, service, trademark or brand name beyond an identification which is reasonably related to the use of such service or property in such broadcast.

**Force Majeure.** Neither Party shall be deemed in default, breach or otherwise liable under this Agreement due to its inability to perform its obligations by reason of events beyond the reasonable control of the Party unable to perform, including fire, earthquake, flood, snowstorm, epidemic, failure of telecommunications facilities or providers, explosion, strike, lockout, labor controversy, riot, civil disturbance, act of public enemy, embargo, war, terrorism, act of God, or the enactment of any new ordinance or law, or any executive, administrative or judicial order (which order is not the result of any act or omission that would constitute a default hereunder), or any similar cause beyond that Party's reasonable control.

**Waiver.** Except as otherwise provided in this Agreement, any failure of a party to comply with any obligation, covenant, agreement or condition herein may be waived by the party entitled to the benefit thereof only by a written instrument signed by the party granting such waiver. Such waiver or failure to insist upon strict compliance with such obligation, representation, warranty, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

**Severability.** In the event any one or more of the provisions of this Agreement shall for any reason be held to be invalid, illegal or unenforceable, then (i) the illegal or unenforceable provision shall be replaced by a revised provision, which, being valid, legal and enforceable, comes closest to the intention of the parties underlying the invalid, illegal, or unenforceable provision and (ii) the remainder of the Agreement will remain binding and in full force and effect.

**Governing Law.** The interpretation and enforcement of this Agreement shall be governed by the laws of the State of Illinois, as applied to contracts executed and performed entirely within Illinois by Illinois residents.

**No Rights in Third Parties.** This Agreement is made for the benefit of the parties and their respective subsidiaries and affiliates, if any, and not for the benefit of any third parties.

**Counterparts.** This Agreement may be executed in one or more counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same instrument.

**Notices.** All notices, reports, requests, acceptances and other communication required or permitted under this Agreement will be in writing. They will be deemed given (a) when delivered personally, (b) when sent by confirmed telex, (c) one day after having been sent by commercial overnight courier with written verification of receipt, or (d) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid. All communications will be sent to the receiving party to the address set forth herein, or to such other address that the receiving party may designate by notice pursuant to this Section.

5

If to Media Syndication Services:

Media Syndication Services
Attn:  Paul Woodhull
660 Pennsylvania Ave. SE #303
Washington, DC 20003
Fax: 202.546-8435
Phone: 202.544-4457

If to NAR:

National Association of REALTORS®
430 North Michigan Ave.
Chicago, IL 60611-4087
Attn.: Pamela Guerds Kabati
Fax:     202-383-1231
Phone: 202-383-1044

With copy to:

National Association of REALTORS®
430 N. Michigan Ave
Chicago, IL 60611-4087
Attn: General Counsel
Fax: 312-329-8256
Phone: 312-329-8270

**Entire Agreement.**  This Agreement constitutes the entire agreement and understanding between the parties with respect to its subject matter and may not be contradicted by evidence of any prior or contemporaneous oral or written agreement. No amendment or modification of this Agreement shall be effective or binding upon either party unless it is set forth in writing and signed by both parties.

        In Witness Whereof, the parties hereto have duly executed this Agreement as of the date first set forth above.

Media Syndication Services, Inc.                NATIONAL ASSOCIATION OF REALTORS®

By: _____                By: _____

Name: Paul Woodhull_____                Name: Dale Stinton

Title: President_____                Title: CEO_____

6



EXHIBIT 2











